# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-02120-SCT

*MISSISSIPPI STATE UNIVERSITY AND THE IAMS COMPANY*

*v.*

*PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/28/2006 |
| TRIAL JUDGE: | HON. DOROTHY WINSTON COLOM |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JENNIFER G. RUSH |
| | JOHNNIE M. HALEY |
| | JAMES P. STREETMAN, III |
| | KENNETH TREY O'CAIN |
| | LEAH LOUISE NICHOLS |
| ATTORNEY FOR APPELLEE: | ROBERT B. McDUFF |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED - 07/31/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1. Following Mississippi State University's ("MSU") denial of its records request, People for the Ethical Treatment of Animals, Inc. ("PETA") filed a complaint in the Chancery Court of Oktibbeha County seeking disclosure. In its initial request, PETA sought records relating to any and all research projects, tests, and/or experiments that initially received funding and/or sponsorship and any and all installments thereof, in whole or in part,

from The Iams Company ("Iams") or an affiliate and for which *in vivo* animal research was conducted at MSU from 1999 to date.

¶2. For the period requested, MSU and Iams entered into a series of "Agreement[s]," "Research Agreement[s]," "Non-Disclosure Agreement[s]," and "Agreement[s] to Provide Animal Care Facilities and Technical Services." These agreements provided for "secrecy of information," "no disclosure of confidential information," and "intellectual property rights," and mandated that "[b]oth parties agree to comply with all relevant federal, state, county, and municipal executive orders, rules, regulations, ordinances and laws." For example, MSU warranted that its animal care facilities "conform to the animal care and use guidelines set forth by the United States Animal Welfare Act[,] . . . regulations set forth in 9 CFR parts 1, 2, and 3[,] . . . and other applicable laws and policies regarding the care and use of vertebrate animals for research and training purposes."

¶3. PETA's request subsequently was modified to seek only Institutional Animal Care and Use Committee ("IACUC") records for projects, tests, and experiments funded by Iams, the creation of which were a requisite condition under MSU's agreements with Iams. Thus, PETA sought a compilation of data and information recorded on animal care protocol review forms prepared by MSU in conjunction with Iams, with whom it contracted to perform studies and research. The protocol review forms included, *inter alia*, the name of the principal investigator(s); title of the project; project period; project summary; proposed species of animals; numbers of animals; experimental design; rationale for involving animals in the study and justification for using the species selected; care and use of the animals; names and qualifications of personnel involved in the project; protocol updates and

2

amendments; and history of protocols. The purpose of the studies and research, as well as the type and number of animals, was controlled by contractual agreements between the sponsor (Iams) and institution (MSU). Federal law mandates the use of protocols when live vertebrate animals are involved in research. After Iams was granted leave to intervene, it filed a "Motion for an Order Prohibiting the Disclosure of Exempt Information," unopposed by MSU, asserting that the documents PETA requested were exempt from disclosure pursuant to Mississippi Code Annotated Sections 25-61-9(3) and 79-23-1(3). Following an *in camera* review of the subject records, the chancellor entered her order which, *inter alia*, stated that "IACUC is governed by rules adopted by it and MSU, as well as by rules imposed by applicable federal[1] and state law[,]" but then concluded that the exemptions were largely inapplicable and ordered disclosure to PETA, subject to limited conditions. From that order, MSU and Iams filed their "Joint Notice of Appeal."

---

[1]The Mississippi Public Records Act of 1983 mandates consideration of applicable federal law, stating:

> [t]he provisions of this chapter shall not be construed to conflict with, amend, repeal or supersede any constitutional or statutory law or decision of a court of this state or the United States which at the time of this chapter is effective or thereafter specifically declares a public record to be confidential or privileged, or provides that a public record shall be exempt from the provisions of this chapter.

Miss. Code Ann. § 25-61-11 (Rev. 2006). *See also* Miss. Code Ann. § 25-61-13(1) (Rev. 2006) (in determining "whether such public record is exempt from the provisions of this chapter, . . . the court shall take into consideration any constitutional or statutory law or decision of any court of this state or the United States or any rule of common law."). 7 U.S.C. § 2143(a)(6)(B) states "[n]o rule, regulation, order, or part of this chapter shall be construed to require a research facility to disclose publicly or to the Institutional Animal Committee during its inspection, trade secrets or commercial or financial information which is privileged or confidential." 7 U.S.C. § 2143(a)(6)(B) (1985).

3

## BACKGROUND

¶4.    The federal Animal Welfare Act ("Act"), 7 U.S.C. § 2131 *et seq*., provides "that regulation of animals and activities as provided in this chapter . . . insure[s] that animals intended for use in research facilities . . . are provided humane care and treatment[.]" 7 U.S.C. § 2131(1) (1976).  Underlying such regulation is the recognition by Congress that:

> (1) the use of animals is instrumental in certain research and education for advancing knowledge of cures and treatment for diseases and injuries which afflict both humans and animals; [and] . . .
>
> (4) measures which help meet the public concern for laboratory animal care and treatment are important in assuring that research will continue to progress.

Pub.L. 99-198, tit. XVII, § 1751, 99 Stat. 1645 (1985) (Congressional findings for 1985 amendment).

¶5.    Toward the end of guaranteeing humane care and treatment, the Act provides that the Secretary of Agriculture of the United States ("Secretary"):

> (a)(1) . . . shall promulgate standards to govern the humane handling, care, treatment, and transportation of animals by . . . research facilities . . . .
> (2) The standards described in paragraph (1) shall include minimum requirements –
>
>> (A) for handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, adequate veterinary care, and separation of species where the Secretary finds necessary for humane handling, care, or treatment of animals; and
>> (B) for exercise of dogs, as determined by an attending veterinarian in accordance with the general standards promulgated by the Secretary . . . .
>
> (3) In addition to the requirements under paragraph (2), the standards described in paragraph (1) shall, with respect to animals in research facilities, include requirements –

(A) for animal care, treatment, and practices in experimental procedures to ensure that animal pain and distress are minimized, including adequate veterinary care with the appropriate use of anesthetic, analgesic, or tranquilizing drugs, or euthanasia;

(B) that the principal investigator considers alternatives to any procedure likely to produce pain to or distress in an experimental animal;

(C) in any practice which could cause pain to animals –

(I) that a doctor of veterinary medicine is consulted in the planning of such procedures;

(II) for the use of tranquilizers, analgesics, and anesthetics;

(III) for pre-surgical and post-surgical care by laboratory workers, in accordance with established veterinary medical and nursing procedures;

(IV) against the use of paralytics without anesthesia; and

(V) that the withholding of tranquilizers, anesthesia, analgesia, or euthanasia when scientifically necessary shall continue for only the necessary period of time;

(D) that no animal is used in more than one major operative experiment from which it is allowed to recover except in cases of –

(I) scientific necessity; or

(II) other special circumstances as determined by the Secretary; and

(E) that exceptions to such standards may be made only when specified by research protocol and that any such exception shall be detailed and explained in a report outlined under paragraph (7) and filed with the Institutional Animal Committee. . . .

(7)(A) The Secretary shall require each research facility to show upon inspection, *and to report at least annually, that the provisions of this Act are being followed and that professionally acceptable standards governing the care, treatment, and use of animals are being followed by the research facility during actual research or experimentation.*

(B) In complying with subparagraph (A), such research facilities shall provide –

> (I) information on procedures likely to produce pain or distress in any animal and assurances demonstrating that the principal investigator considered alternatives to those procedures;
> (II) assurances satisfactory to the Secretary that such facility is adhering to the standards described in this section; and
> (III) an explanation for any deviation from the standards promulgated under this section.

7 U.S.C. § 2143(a) (1985) (emphasis added).

¶6.     The mechanism for reviewing the proposed activities of animal research facilities for compliance with the federally established requirements begins with the IACUC. *See* 7 U.S.C. § 2143 (1985); 9 C.F.R. § 2.31(a) & (d) (1998). The data and information sought by PETA is recorded on animal care protocol review forms submitted to the IACUC by MSU in conjunction with its contractual obligation with Iams to comply with federal law. Regarding the IACUC, the Act provides:

> (b)(1) The Secretary shall require that each research facility establish at least one Committee. Each Committee shall be appointed by the chief executive officer of each such research facility and shall be composed of not fewer than three members. Such members shall possess sufficient ability to assess animal care, treatment, and practices in experimental research as determined by the needs of the research facility *and shall represent society's concerns regarding the welfare of animal subjects used at such facility*. Of the members of the Committee –
>
> > (A) at least one member shall be a *doctor of veterinary medicine*;
> > (B) at least one member –
> >
> > > (I) shall *not* be affiliated in any way with such facility other than as a member of the Committee;
> > > (II) shall *not* be a member of the immediate family of a person who is affiliated with such facility; and

(III) *is intended to provide representation for general community interests in the proper care and treatment of animals*; and

(C) in those cases where the Committee consists of more than three members, not more than three members shall be from the same administrative unit of such facility.

7 U.S.C. § 2143(b)(1) (1985) (emphasis added). *See also* 9 C.F.R. § 2.31(b) (1998)

(regarding IACUC membership criteria). As to the function of the IACUC, the Act states:

(3) The Committee shall inspect *at least semiannually* all animal study areas and animal facilities of such research facility and review as part of the inspection –

(A) practices involving pain to animals, and
(B) the condition of animals,

to ensure compliance with the provisions of this chapter to minimize pain and distress to animals. . . .

(4)(A) The Committee shall file an *inspection certification report* of each inspection at the research facility. Such report shall –

(I) be signed by a majority of the Committee members involved in the inspection;
(II) include reports of any violation of the standards promulgated, or assurances required, by the Secretary, including any deficient conditions of animal care or treatment, any deviations of research practices from originally approved proposals that adversely affect animal welfare, any notification to the facility regarding such conditions, and any corrections made thereafter;
(III) include any minority views of the Committee; and
(IV) include any other information pertinent to the activities of the Committee.

(B) *Such report shall remain on file for at least three years at the research facility and shall be available for inspection by the Animal and Plant Health Inspection Service* [("APHIS")] *and any funding Federal agency.*[2]

(C) . . . If . . . deficiencies or deviations remain uncorrected, the Committee shall notify (in writing) the [APHIS] and the funding Federal agency of such deficiencies or deviations.

(5) *The inspection results shall be available to Department of Agriculture inspectors for review during inspections.*

7 U.S.C. § 2143(b) (1985) (emphasis added). The federal regulations summarize the role of the IACUC as follows:

(c)(1) Review, *at least once every six months*, the research facility's program for humane care and use of animals . . . ;

(2) Inspect *at least once every six months*, all of the research facility's animal facilities, including animal study areas . . . ;

(3) Prepare reports of its evaluations conducted as required . . . and submit the reports to the Institutional Official of the research facility . . . . The reports shall be reviewed and signed by a majority of the IACUC members and must include any minority views. The reports shall be updated at least once every six months upon completion of the required semi-annual evaluations and shall be maintained by the research facility and made available to APHIS and to officials of funding Federal agencies for inspection and copying upon request. . . .

(4) *Review, and, if warranted, investigate concerns involving the care and use of animals at the research facility resulting from public complaints received*

---

[2]9 C.F.R. § 2.35(f) adds:

[a]ll records shall be available for inspection and copying by authorized APHIS or funding Federal agency representatives at reasonable times. *APHIS* inspectors *will maintain the confidentiality of the information* and will not remove the materials from the research facilities' premises unless there has been an alleged violation, they are needed to investigate a possible violation, or for other enforcement purposes. *Release of any such materials, including reports, summaries, and photographs that contain trade secrets or commercial or financial information that is privileged or confidential will be governed by applicable sections of the Freedom of Information Act.*

9 C.F.R. § 2.35(f) (2004) (emphasis added).

8

*and from reports of noncompliance received from laboratory or research facility personnel or employees*; . . .
(8) Be authorized to suspend any activity involving animals in accordance with the specifications set forth in paragraph (d)(6) of this section.[3]

9 C.F.R. § 2.31(c) (1998) (emphasis added).

¶7.    Providing additional oversight, "[t]he *Secretary* shall inspect each research facility *at least once each year* and, in the case of deficiencies or deviations from the standards promulgated under this chapter, shall conduct such follow-up inspections as may be necessary until all deficiencies or deviations from such standards are corrected."  7 U.S.C. § 2146(a) (1990) (emphasis added).

¶8.    The extensive regulations, standards, requirements, and investigatory powers mandated by the Act are to protect the general public and address society's concerns regarding the humane care of the animal population.  Given such sweeping authority to supervise research facilities, Congress, in its wisdom, granted those involved protection against third parties, competitors, or interlopers.  Thus, the Act also provides "[n]o rule, regulation, order, or part of this chapter shall be construed to require a research facility *to disclose publicly or to the Institutional Animal Committee during its inspection, trade secrets or commercial or financial information which is privileged or confidential*."  7 U.S.C. § 2143(a)(6)(B) (1985) (emphasis added).  Furthermore, the Act provides:

(a) It shall be *unlawful* for any member of an Institutional Animal Committee to release *any confidential information of the research facility including any information that concerns or relates to* –

---

[3]The IACUC also "may suspend an activity that it previously approved if it determines that the activity is not being conducted in accordance with the description of that activity provided by the principal investigator and approved by the Committee."  9 C.F.R. § 2.31(d)(6) (1998).

(1) the trade secrets, processes, operations, style of work, or apparatus; or

(2) the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures,

of the research facility.

(b) It shall be *unlawful* for any member of such Committee –

(1) to use or attempt to use to his advantages; or

(2) to reveal to any other person,

any information which is entitled to protection as *confidential information* under subsection (a) of this section.

7 U.S.C. § 2157 (1985) (emphasis added). Severe criminal and civil penalties apply for violations. *See* 7 U.S.C. § 2157(c) & (d) (1985). There has been no allegation, assertion, or averment by PETA that either MSU or Iams failed to satisfy these obligations. Nor is there evidence that PETA sought this information through the federal government via the federal Freedom of Information Act. Given this background, PETA sought the data and information through a perceived aperture created by the Mississippi Public Records Act of 1983.

**FACTS**

¶9. On January 18, 2006, PETA filed a complaint against MSU "to redress the failure of [MSU] to comply with the Mississippi Public Records Act . . . , § 25-61-1 *et seq.*, in responding to a public records request from [PETA] . . . ." According to the complaint, PETA twice narrowed the breadth of its request, eventually "seeking only IACUC protocols and update/amendment forms . . . ."[4] Thereafter, the complaint provides that PETA sought:

---

[4]Federal regulations mandate that:

[a] proposal to conduct an activity involving animals, or to make a significant

10

to persuade MSU to lower the fee . . . [and] MSU's general counsel stated that he would release only 19 pages of responsive records . . . . He stated that an additional 534 pages were responsive but would not be released, claiming that the records contain trade secrets or commercial and financial information of a proprietary nature that fall within exceptions to the Public Records Act set forth in Miss. Code Ann. §§ 25-61-9(3) and 79-23-1.

PETA requested that the chancery court "order [MSU] to produce the . . . records sought here without charging an unreasonable and unnecessary fee and award to [PETA] all costs and expenses, including attorneys' fees." Iams subsequently filed a "Motion for Leave to Intervene," which was granted by the chancery court. On February 20, 2006, MSU filed its "Defenses and Answer," which included the affirmative defenses that "[t]he documents [PETA] seeks . . . constitute trade secrets, as well as confidential commercial and financial information of a proprietary nature which are not subject to inspection, examination, copying or reproduction under the Mississippi Public Records Act[,]" and "[t]he documents [PETA]

---

change in an ongoing activity involving animals, must contain the following:

> (1) Identification of the species and the approximate number of animals to be used;
> (2) A rationale for involving animals, and for the appropriateness of the species and numbers of animals to be used;
> (3) A complete description of the proposed use of the animals;
> (4) A description of procedures designed to assure that discomfort and pain to animals will be limited to that which is unavoidable for the conduct of scientifically valuable research, including provision for the use of analgesic, anesthetic, and tranquilizing drugs where indicated and appropriate to minimize discomfort and pain to animals; and
> (5) A description of any euthanasia method to be used.

9 C.F.R. § 2.31(e) (1998). The above disclosures are part of the data and information recorded on the IACUC protocol forms.

seeks . . . are exempt from disclosure pursuant to Miss. Code Ann. §§ 25-61-9, 25-61-11, and 79-23-1 . . . ." Iams reiterated those defenses in its "Answer and Defenses," with the additional defense that "[t]he documents and information [PETA] seeks . . . are exempt from disclosure because they are subject to contracts between Iams and [MSU] that require the documents and information to be maintained confidentially."[5]

¶10. On March 21, 2006, Iams filed a "Motion for an Order Prohibiting the Disclosure of Exempt Information,"[6] alleging that "pursuant to Miss. Code Ann. § 25-61-9 and § 79-23-1, the information requested by PETA is exempt from disclosure." According to Iams:

> [t]he disclosure of the information requested by PETA and identified by [MSU] will cause immediate and irreparable injury, loss and damage to Iams. The requested information is Iams' intellectual property which is highly confidential. Furthermore, the information sought could be used to harass the scientists performing the study and/or to hinder the completion of the study. The requested information constitutes "trade secrets" since they deal with projects relating to product development that are not in the public domain. Furthermore, the information is confidential and of a proprietary nature as identified and set forth by State and Federal law.[7]

---

[5]Furthermore, Iams' Answer provided that MSU "indicated that it would release only 19 pages of responsive documents. Iams specifically avers that the 19 pages of responsive documents contain proprietary and confidential information which would be redacted before production."

[6]MSU did not oppose this motion.

[7]In its supporting memorandum, Iams added that:

[t]his Court should grant Iams' request for a protective order because the agreements between MSU and Iams prohibit disclosure to PETA. The agreements between MSU and Iams identify the studies concerning product formulations and new product development. Thus, the strategic product development and corresponding agreements are confidential and proprietary.

12

In support of the motion, Iams attached the affidavit of Daniel P. Carey, D.V.M., Director of Technical Communications for Iams. The affidavit related that Carey's:

> job responsibilities include the review of public records requests made by third parties that are seeking information concerning Iams' studies. As a result, I am generally familiar with state statutes concerning the protection of intellectual property, and I have read Mississippi Code Annotated §§ 25-61-1, et seq. and 75-26-1, et seq.

Carey attested that the information PETA requested:

> would reveal: (a) the title of the project; (b) the identity (or identities) of the scientists conducting the work; (c) the processes and techniques (scientific protocols) that are involved in the studies; (d) the purpose and content, i.e., the scientific hypothesis that is being tested; and (e) the timetable. Significantly, these protocols do not indicate whether or not these studies were completed, only that they were planned at one time.

Carey's affidavit averred that the information "constitutes trade secrets and confidential commercial information that are Iams' intellectual property." Specifically, that information "would reveal a portion of [Iams'] strategic product development portfolio. . . . These studies relate directly to new products and ideas for product development . . . ." Moreover, "[t]he subjects that Iams is studying at MSU have independent economic value because they are not generally known by competitors in the marketplace. Iams' studies would indicate, among other things, its formulations, improvements, and product development."[8] The affiant concluded that "[t]he highly confidential information and intellectual property of Iams could

---

[8]Carey further swore that "[i]n order to protect the confidentiality of these projects, Iams has entered into agreements with MSU. These agreements prohibit the disclosure of information provided by Iams and information developed for Iams by MSU."

13

be used by PETA to identify specific researchers at MSU and Iams, who are engaged in the studies, and to harass or annoy [them]."[9]

¶11.   On April 19, 2006, PETA filed its "Response to Motion of Defendant-Intervenor For a Protective Order Prohibiting the Disclosure of Certain Information."  PETA expressed "no objection to an order prohibiting disclosure of those documents pending the resolution of this case on the merits or pending further order of the [c]ourt upon application of a party."  The Response added that "PETA does not intend *at this time* to . . . seek disclosure of the documents until this case is tried on the merits.  Accordingly, there is no need for a protective order." (Emphasis added).  That same day, PETA's "Interrogatories and Document Requests to Defendant and Defendant-Intervenor" were served upon counsel for MSU and Iams.

¶12.   On April 24, 2006, Iams filed its "Reply Memorandum in Support of its Motion for an Order Prohibiting the Disclosure of Exempt Information," noting that the chancery court "has the authority to consider the documents at issue in camera in order to satisfy itself that the materials being withheld by [MSU] are exempt from disclosure."  *See also* Miss. Code Ann. § 25-61-13(2) (Rev. 2006).  Based upon that review, Iams argued that the chancery court "should permanently grant an Order that no disclosure shall take place[,]" because "nothing in . . . discovery will refute the statements made in Dr. Carey's affidavit, nor will it affect this [c]ourt's ability to consider and rule on the documents in camera."  On April 28, 2006, MSU filed its "Motion for Protective Order and for Permission to Submit Documents

_____

[9]Carey's affidavit revealed that PETA has previously taken Iams' studies and reproduced them on a website entitled "IamsCruelty.com."  Carey added that "PETA has . . . used this website to publicize this records request."

14

Under Seal." MSU contended that the protective order should pertain to PETA's discovery requests "unless or until the [c]ourt determines that the records requested . . . are not exempt from disclosure following an *in camera* review of the records . . . and Iams' Motion for Order Prohibiting Disclosure of Exempt Information." That same day, Iams filed its "Motion for Protective Order," providing that "[r]ather than proceed with discovery at this time, [Iams] would respectfully request this Court to review *in camera* the documents that [MSU] withheld from public disclosure, and determine whether they should be withheld."[10]

¶13.     On May 8, 2006, PETA filed its "Response in Opposition to Motions for a Protective Order to Prevent Discovery." According to PETA, "without that discovery, [PETA] does not have the information it should have in order to argue the reasons why the documents should be disclosed under the Public Records Act." While conceding that "an in camera review may be appropriate at some point," PETA contended that would be the case only after it "has received discovery and is in a position to make a full presentation to the [c]ourt about the reasons the documents should be disclosed."[11] On May 30, 2006, PETA's "Second Set of Interrogatories and Document Requests to Defendant and Defendant-Intervenor" were served upon MSU and Iams.

---

[10]Iams' accompanying "Memorandum in Support of Motion for Protective Order," provided that "[t]he need for and scope of discovery should be dictated by this Court's *in camera* review of the documents. Until the *in camera* review is complete, any discovery is premature. . . . If the Court has questions about any of the withheld documents, then some discovery may be necessary."

[11]In its Response, Iams argued that "[p]remature discovery would turn the Mississippi Public Records Act on its head and enable [PETA] to use discovery as a backdoor to obtain the confidential and proprietary information of Iams."

¶14. On June 6, 2006, PETA filed the affidavit of Shalin Gala, a research associate in PETA's Research and Investigation Department,[12] as a supplement to its "Response to Motion of Defendant-Intervenor for a Protective Order Prohibiting the Disclosure of Certain Information" in case "the [c]ourt construes Iams' request as a Rule 56 motion." The first paragraph of Gala's affidavit stated that "PETA has conducted a public relations campaign against [Iams] because of cruelty to animals in unnecessary experiments that Iams has funded." Paragraph seven asserted "[p]rotocol review forms similar to those requested here . . . are routinely released by state and federal agencies[13] to PETA . . . ." Paragraph eight then provided that the IACUC protocol forms requested by PETA:

> do not reveal the results of the experiment. Typically, they do provide a project summary because the information is necessary to determine the level of pain and distress to which the animals will be exposed. A blank copy of the protocol review form apparently used at MSU was obtained from that University's website and is attached to this affidavit.

Overall, the affidavit fails to contradict the pertinent parts of the Carey affidavit, other than to conclusively suggest, without factual support, that "we do not see how these types of information can jeopardize any proprietary interest that Iams might have in the experiments at issue."

¶15. On June 7, 2006, the chancery court heard arguments on MSU and Iams' "Motion for an Order Prohibiting Disclosure of Exempt Information," "Motion for Protective Order," and "Motion for Protective Order and Permission to Submit Under Seal;" and PETA's "Motion

---

[12]The affidavit declared that Gala is a research associate, without furnishing background information on her training, qualifications, or area(s) of expertise.

[13]Based upon the federal law and regulations, discussed *supra*, this statement is accurate only insofar as permission is presumed.

to Extend Discovery Period." On June 8, 2006, the chancery court ordered MSU "to submit [the contract(s) entered into by and between MSU and Iams] under seal for the Court's *in camera* review . . . ." On June 23, 2006, the chancery court entered an order providing:

> it is necessary and permitted pursuant to Miss. Code Ann. § 25-61-13(2) for the Court to review the subject 534 documents via an *in camera* inspection, and thereby orders the following . . .
>
> (1) MSU and/or [Iams] is ordered to produce within 30 days of the issuance of this order all documents it does not, in good faith, claim are privileged and/or protected pursuant to the MS Trade Secrets Act and/or MS Public Records Act of 1983;
>
> (2) For documents and responses it claims are privileged or otherwise protected, MSU and/or [Iams] is hereby directed to provide to this Court under seal within 30 days of the issuance of this order the subject documents and responses, along with a detailed privilege log in which each such response and/or document claimed to be privileged or otherwise protected, is listed and identified by document name (if it is claimed that the document name itself is privileged and/or protected, then said document is to be identified numerically), and the nature of the privilege and/or protection claimed. A copy of the privilege log shall be provided to PETA; and
>
> (3) PETA's Motion to Extend Discovery Period is hereby stayed pending this Court's *in camera* inspection of the documents and ruling on the same.

¶16.    MSU submitted a "Log of Confidential Documents" which listed each project title as "confidential" and claimed a "privilege/protection" for each IACUC protocol form based upon "(1) Miss. Code Ann. § 25-61-9, 25-61-11; (2) Miss. Code Ann. § 75-26-3, 75-26-11; (3) Miss. Code Ann. § 79-23-1; (4) Miss. R. Civ. P. 26; (5) *Elec. Data Sys. Corp. v. Miss. Div. of Medicaid*, 853 So. 2d 1192 (Miss. 2003); and *Caldwell & Gregory, Inc. v. Univ. of S. Miss.*, 716 So. 2d 1120 (Miss. Ct. App. 1998)," also adding that the "agreements between [MSU] and [Iams] . . . contain confidentiality provisions." Thereafter, PETA filed an "Objection to MSU's Privilege Log," arguing that "the [c]ourt should require MSU and Iams

17

to provide a more detailed privilege log, including specificity as to which items in each document are exempt and which are not . . . ."

¶17. On November 29, 2006, the chancery court entered an order "following its review of the documents submitted under seal to the Court in accordance with its prior orders." Preliminarily, the chancery court provided the following:

[f]irst, this Court feels compelled to address [PETA's] position that at some point there will be discovery and a full-blown trial on these issues. It is this Court's opinion and finding that the Act, specifically § 25-61-13, envisions that once a suit is filed following the denial to inspect or copy public records, it is the Court that shall determine whether such public records are exempt from the provisions of the Act. In doing so, the court may privately view the public records in controversy before reaching a decision. This makes perfect sense in light of the fact that should the documents be exempted from the Act, this procedure prevents needless disclosure of the same. This Court can only contemplate the necessity of discovery and/or a trial if after reviewing the documents there appears to be some factual issues that must be resolved.

Second, the Act sets a public policy that public records be made available to the public. MSU, a public university receiving state and federal funds, is obviously a public body as defined under the Act and thus must allow access to public records. In determining whether or not documents are "public records," the Mississippi Supreme Court has held that any questions of disclosure must be construed liberally, while a standard of strict construction must be applied to any exceptions to disclosure. *Mississippi Dep't of Wildlife, Fisheries and Parks v. Mississippi Wildlife Enforcement Officers' Ass'n, Inc.*, 740 So. 2d 925, 936 (Miss. 1999). Furthermore, any doubt about disclosure of the requested information by the public body should be resolved in favor of disclosure. *Id*.

And finally, . . . the IACUC is a committee created by [MSU] pursuant to the Federal Animal Welfare Act, 7 U.S.C. §§ 2131-2157 (1985). Its purpose is to review all proposals for use of vertebrate animals for research at the university, in order to assure that the research animals will be properly treated according to federally established guidelines. . . . [T]he IACUC requires the "principal investigator" seeking funding for a project using vertebrate animals to submit to the committee a protocol application. The application seeks to elicit information regarding what type of animals are to be used and how many, the care and use of the animals throughout the experiment as well as the method

18

of euthanasia, if necessary, among other things. It is these protocols that are the subject of this case.

Regarding the Mississippi Uniform Trade Secrets Act, the chancellor reviewed each IACUC protocol form and concluded that MSU and Iams failed to "articulate, particularize or specify a justification so as to establish with specificity that the protocols are a trade secret."[14] While finding that the protocols were not themselves trade secrets, the chancellor did determine "that the subsection entitled 'Experimental Design' on all tabbed protocols are trade secrets and therefore protected with the exception of those numbered: 6, 7, 13, 18, 20 and 32 (and therefore not protected)." As to the Mississippi Public Records Act, particularly the exemption of Mississippi Code Annotated Section 25-61-9(3):

> the Court . . . finds that the focus in analyzing Defendants' . . . claim for exemption is not "Whether or not the protocols are confidential commercial or financial information?", but rather, "Were the protocols *developed* by MSU *under contract* (confidential or otherwise) with Iams?" (emphasis added). The Court finds that the answer to the latter question is – No. It is clear that *the protocols were not developed pursuant to any confidential contract that MSU has with Iams. The protocols were generated because they are required by the IACUC and supporting federal legislation.*

(Emphasis added). While conceding that "[i]t *could be argued* that the protocols were indirectly generated by the contracts entered into by and between MSU and Iams," the chancellor found Section 25-61-9(3) did not apply. (Emphasis added). In sum, the chancellor ordered:

> the disclosure of the subject documents to PETA under the following conditions: MSU shall redact any information in the protocols relating to the names of the researcher(s) and staff member(s), their telephone numbers,

[14]Had the Chancellor sought specific or particular justification to be further articulated (i.e., for MSU and Iams to expound upon the only credible evidence presented, the contracts and Carey's affidavit), she could have required an evidentiary hearing.

19

addresses and their experience, as well as the experimental design information previously set forth for all tabbed documents except those numbered 6, 7, 13, 18, 20 and 32; and . . . within fourteen (14) days of the entry of this order, MSU shall submit to PETA the costs of copying the protocols. Miss. Code Ann. § 25-61-7. Upon redaction and payment, MSU is hereby ordered to provide the protocols to PETA.

From that Order, MSU and Iams timely filed a "Joint Notice of Appeal."

## ISSUES

¶18. This Court will consider:

(1) Whether the chancery court erred in holding that the data and information recorded on the IACUC protocol forms, which formed the basis of PETA's records request, were not protected from disclosure by the Mississippi Public Records Act of 1983.[15]

## ANALYSIS

¶19. "This Court's review of a trial court's interpretation of a statute presents a question of law; we review questions of law *de novo*." *Miss. Ethics Comm'n v. Grisham*, 957 So. 2d 997, 1000 (Miss. 2007) (quoting *32 Pit Bulldogs v. County of Prentiss*, 808 So. 2d 971, 973 (Miss. 2002)) (emphasis added).[16] "In considering a statute passed by the legislature, . . . the first question a court should decide is whether the statute is ambiguous. If it is not ambiguous, the court should simply apply the statute according to its plain meaning and should not use principles of statutory construction." *Estate of Klaus v. Vicksburg*

[15]Iams also presented the issue of "[w]hether the trial court erred in ruling that information contained in the [IACUC] protocols, which form the basis of [PETA's] Public Records Request, did not contain trade secrets under the Mississippi Uniform Trade Secrets Act and thus were not exempt from disclosure." However, this Court finds that resolution of the Mississippi Public Records Act issue is case-dispositive.

[16]PETA's brief acknowledges that "the Chancellor's conclusion that . . . the protocol review forms . . . were not developed 'under contract' with Iams" is "an interpretation of law[.]"

*Healthcare, LLC*, 972 So. 2d 555, 556 (Miss. 2007) (quoting *City of Natchez v. Sullivan*, 612 So. 2d 1087, 1089 (Miss. 1992) (citations omitted)).

¶20.    For purposes of our review, we made a detailed examination of the documents in dispute and of the affidavits presented to the Court for consideration. We do not presume to possess the scientific or commercial acumen to discern or evaluate what may be of interest or value to a known competitor or a third-world start-up company. However, in the absence of contradictory evidence, courts are bound to accept the only credible evidence offered in a proceeding and apply the correct law. The chancellor's error was in concluding that the protocol review forms were not developed under contract, for both the contracts and Carey's affidavit, the only credible evidence presented, plainly contradict that conclusion. In fact, the requirement that the protocol review forms be utilized was a condition of the contracts,[17] and failure to do so would constitute a breach thereof. Additionally, this record is devoid of evidence to dispute that the data and information contained in the documents has proprietary value.

¶21.    The Mississippi Public Records Act provides that "[i]t is the policy of this state that public records shall be available for inspection by any person *unless otherwise provided by this chapter*; furthermore, providing access to public records is a duty of each public body . . . ." Miss. Code Ann. § 25-61-2 (Rev. 2006) (emphasis added). There is no question that MSU is a "public body." *See* Miss. Code Ann. § 25-61-3(a) (Rev. 2006) ("'[p]ublic body' shall mean any department, bureau, division, council, commission, committee, subcommittee,

---

[17]Specifically, "[b]oth parties agree to comply with all relevant federal, state, county, and municipal executive orders, rules, regulations, ordinances and laws."

board, agency and any other entity of the state or a political subdivision thereof . . . .").

Furthermore, the IACUC protocol forms requested by PETA are "public records." *See* Miss. Code Ann. § 25-61-3(b) (Rev. 2006) ("'[p]ublic records' shall mean all . . . records, papers, accounts, . . . and any other documentary materials . . . having been used, being in use, or prepared, possessed or retained for use in the conduct, transaction or performance of any business, transaction, work, duty or function of any public body, or required to be maintained by any public body."). Mississippi Code Annotated Section 25-61-5 outlines the parameters of the disclosure requirement providing, in pertinent part, that:

> (1) *Except as otherwise provided by* Sections 25-61-9 and 25-61-11, all public records are hereby declared to be public property, and any person shall have the right to inspect, copy or mechanically reproduce or obtain a reproduction of any public record of a public body in accordance with reasonable written procedures adopted by the public body concerning the cost, time, place and method of access, and public notice of the procedures shall be given by the public body, or, in the event that a public body has not adopted such written procedures, the right to inspect, copy or mechanically reproduce or obtain a reproduction of a public record of the public body shall be provided within one (1) working day after a written request for a public record is made. . . .
>
> (2) Denial by a public body of a request for access to or copies of public records under this chapter shall be in writing and shall contain a statement of the specific reasons for the denial.

Miss. Code Ann. § 25-61-5 (Rev. 2006) (emphasis added).

¶22.    But these parameters are not without limit. Relevant legislatively created exemptions to Mississippi Code Annotated Section 25-61-5 are found in Mississippi Code Annotated Sections 25-61-9 and 25-61-11. *See* Miss. Code Ann. § 25-61-5(1) (Rev. 2006). Mississippi Code Annotated Section 25-61-9 specifically states that:

> (1) Records *furnished to public bodies by third parties* which contain trade secrets or confidential commercial or financial information shall not be subject

22

to inspection, examination, copying or reproduction under this chapter until notice to said third parties has been given, but such records shall be released within a reasonable period of time unless the said third parties shall have obtained a court order protecting such records as confidential.

(2) If any public record which is held to be *exempt* from disclosure pursuant to this chapter contains material which is *not exempt* pursuant to this chapter, *the public body shall separate the exempt material and make the nonexempt material available for examination and/or copying as provided for in this chapter.*

(3) *Trade secrets and confidential commercial and financial information of a proprietary*[18] *nature developed by a college or university under contract with a* firm, *business,* partnership, association, *corporation,* individual *or other like entity shall not be subject to inspection, examination, copying or reproduction under this chapter.*

Miss. Code Ann. § 25-61-9 (Rev. 2006) (emphasis added).  Mississippi Code Annotated Section 25-61-11 provides that:

[t]he provisions of this chapter shall *not* be construed to conflict with, amend, repeal or supersede any constitutional or *statutory law or decision of a court of this state or the United States* which at the time of this chapter is effective or thereafter specifically declares a public record to be confidential or privileged *or provides that a public record shall be exempt from the provisions of this chapter.*

Miss. Code Ann. § 25-61-11 (Rev. 2006) (emphasis added).  *See also* Miss. Code Ann. § 25-61-13(1) (Rev. 2006).  Section 79-23-1(3) assists in this analysis.  Mississippi Code Annotated Section 79-23-1(3) largely mirrors Mississippi Code Annotated Section 25-61-9(3) and reads, "*[t]rade secrets and confidential commercial and financial information of a proprietary nature developed by a college or university under contract with a* firm,

---

[18]"Proprietary" is derived from the Latin term "proprius" which means "one's own" and is defined as "2.  Exclusively owned: Private.  3.  Appropriate to an owner.  4.  Owned by a private individual or corporation under a trademark or patent."  Webster's II New College Dictionary 887 (3d ed. 2001).

*business*, partnership, association, *corporation*, individual *or other like entity shall be exempt from the provisions of the Mississippi Public Records Act of 1983*." Miss. Code Ann. § 79-23-1(3) (Rev. 2001) (emphasis added). Those delineated exemptions are harmonious with applicable federal law, a result mandated by the Mississippi Public Records Act. *See* Miss. Code Ann. §§ 25-61-11, -13 (Rev. 2006). 7 U.S.C. § 2143(a)(6)(B) provides "[n]o rule, regulation, order, or part of this chapter shall be construed to require a research facility *to disclose publicly or to the Institutional Animal Committee during its inspection, trade secrets or commercial or financial information which is privileged or confidential*." 7 U.S.C. § 2143(a)(6)(B) (1985) (emphasis added).

¶23. All agree that the IACUC protocol forms are required by federal law and the blank forms are not confidential, as they are in the public domain. However, MSU and Iams contend and offer proof that the completed forms "contain confidential, proprietary and trade secrets information about Iams' research." Thus, they advance the argument that such information is exempt from disclosure under Sections 25-61-9(3) and 79-23-1(3). This Court agrees with that assessment and concludes that the plain and unambiguous language in both Sections 25-61-9(3) and 79-23-1(3) requires the exemption of the substantive portions of the subject IACUC protocol forms. This exemption is in accord with the federal statutory scheme related to data and information recorded on the forms, as required by the Mississippi Public Records Act. *See* Miss. Code Ann. § 25-61-11 (Rev. 2006); 7 U.S.C. § 2143(a)(6)(B) (1985); 7 U.S.C. § 2157 (regarding penalties for unlawful disclosure of confidential information of the research facility by IACUC members) (1985).

24

¶24.   The chancellor was presented with the pertinent contracts between MSU and Iams, which contained confidentiality agreements, for in camera review.  As MSU and Iams assert:

> [s]ince the beginning of the contractual relationship . . . , Iams has consistently maintained that the information exchanged and developed under its contracts with MSU is of a most confidential nature.  Iams has made more than reasonable efforts to protect this information from disclosure.  All of the contracts between MSU and Iams contain provisions protecting Iams' confidential information.

Carey's substantially uncontroverted affidavit attests that the data and information recorded on the IACUC protocol forms constitutes "*trade secrets*," "*confidential commercial information*," and "*proprietary information*," all with "*independent economic value* because they are not generally known by competitors in the marketplace." (Emphasis added).  PETA submitted no evidence to contradict the testimony of Carey that the data and information recorded on the IACUC protocol forms includes trade secrets or confidential commercial information exempt from disclosure.[19]

¶25.   "Trade secrets and confidential commercial and financial information of a proprietary nature developed by a college or university under contract with a firm, business, partnership, association, corporation, individual or other like entity" either "*shall not be subject to inspection*," Miss. Code Ann. § 25-61-9(3), or "*shall be exempt*[,]" Miss. Code Ann. § 79-23-1(3), under the Mississippi Public Records Act.  (Emphasis added).  In finding these legislatively-mandated exemptions inapplicable, the chancellor erred.  Without question, the IACUC protocol forms are required by federal law.  *See* 7 U.S.C. § 2143 (1985); 9 C.F.R. § 2.31 (1998).  That same federal law also provides "[n]o rule, regulation, order, or part of

---

[19]Gala's affidavit lacked undergirding factual reliability so as to assist the court in drawing any conclusion regarding its accuracy.

this chapter shall be construed to require a research facility *to disclose publicly . . . trade secrets or commercial or financial information which is privileged or confidential.*" 7 U.S.C. § 2143(a)(6)(B) (1985) (emphasis added). PETA offered no proof otherwise. Based on the record before us, the data and information recorded on the forms contained "[t]rade secrets and confidential commercial and financial information of a proprietary nature developed by a college or university[,]" i.e., MSU, "under contract with a business," i.e., Iams.[20] These plain and unambiguous statutory exemptions, expressly established by the Mississippi Legislature, apply regardless of whether the "[t]rade secrets and confidential commercial and financial information of a proprietary nature developed by" MSU "under contract with" Iams would be required to be disclosed under federal law which, in this case, they are not. *See* 7 U.S.C. § 2143(a)(6)(B) (1985). The subject data and information recorded on the IACUC protocol forms was developed by MSU and Iams. Therefore, that "information of a proprietary nature[,]" exclusively owned, furnished, or required by Iams, fits directly within the purview of these statutory exemptions. Thus, the data and information recorded on the forms is not "public property" by virtue of the statutory exemptions in Mississippi Code Annotated Sections 25-61-9(3) and 79-23-1(3). *See* Miss. Code Ann. § 25-61-5(1) (Rev. 2006) ("Except as otherwise provided by Sections 25-61-9 and 25-61-11, all public records are hereby declared to be public property . . . .").

---

[20]The chancellor acknowledged this in part by finding the "Experimental Design" subsections within most of the IACUC protocol forms were exempted as trade secrets pursuant to the Mississippi Uniform Trade Secrets Act.

¶26. This Court cannot ignore the applicability of the plain and unambiguous language of Mississippi Code Annotated Sections 25-61-9(3) and 79-23-1(3) to the case sub judice. *See Gannett River States Publ'g Co. v. Entergy Miss., Inc.*, 940 So. 2d 221, 224 (Miss. 2006). The preferred policy of disclosing public records must cede to the legislatively-mandated exemptions thereto as "the wisdom or folly of the pertinent legislation is strictly within the constitutional power of the Legislature[.]" *Id*. at 226. Any disagreements with those directives are best aimed toward the Legislature.[21]

**CONCLUSION**

¶27. PETA failed to rebut the evidence presented by MSU and Iams that the data and information requested in the subject records constituted trade secrets and/or confidential commercial and financial information of a proprietary nature developed by MSU under contract with Iams. Therefore, this Court finds that the data and information requested by PETA is exempted from the provisions of the Mississippi Public Records Act, in harmony with applicable federal law. *See* Miss. Code Ann. §§ 25-61-9, -11, -13(1), 79-23-1(3); 7 U.S.C. § 2143(a)(6)(B). Accordingly, this Court reverses the November 29, 2006, order of the Chancery Court of Oktibbeha County and remands this case to the trial court for entry of judgment consistent with this opinion.

¶28. **REVERSED AND REMANDED.**

---

[21]Likewise, any issue with the restrictions implemented in the federal Animal Welfare Act, required to be considered under the Mississippi Public Records Act, *see* Miss. Code Ann. §§ 25-61-11, -13, are best directed to Congress.

**SMITH, C.J., WALLER, P.J., CARLSON, DICKINSON AND LAMAR, JJ., CONCUR. DIAZ, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. EASLEY AND GRAVES, JJ., NOT PARTICIPATING.**

**DIAZ, PRESIDING JUSTICE, DISSENTING:**

¶29.   I cannot agree that the information sought by PETA constitutes "trade secrets and commercial and financial information of a proprietary nature," and I must dissent from today's opinion.

¶30.   First, the opinion does not apply the appropriate standard. Because the chancellor's order is an application of law to the facts, the order's factual conclusions are reviewed for an abuse of discretion. "The Supreme Court cannot overturn the decree of a chancellor unless it finds with reasonable certainty that the decree is manifestly wrong on a question of law or *interpretation of facts pertaining to legal questions*." ***City of Pascagoula v. Scheffler***, 487 So. 2d 196, 200 (Miss. 1986) (citing ***Enlargement of Boundaries of Yazoo City v. City of Yazoo City***, 452 So.2d 837 (Miss. 1984)).[22]

¶31.   Second, the majority accepts at face value Iams' and MSU's blanket assertion that the *entire* IACUC protocol form constitutes "proprietary information" with "independent economic value." As the chancellor noted, "MSU and IAMS have chosen to simply label the protocols as trade secrets. They do not articulate, particularize or specify a justification so as to establish with specificity that the protocols are a trade secret." Dr. Carey's affidavit

---

[22]The majority points out in note 17 that whether the protocols were developed under contract is an "interpretation of law." Even if this question was an interpretation of law that should be reviewed de novo, as explained below, this finding relates to only one issue which is immaterial to the question of whether the information constitutes "trade secrets and confidential commercial and financial information of a proprietary nature." Miss. Code Ann. 25-61-9 (Rev. 2006).

28

does not provide evidence of this argument; it is nothing more than a legal conclusion, a decision entirely within the purview of the chancellor.

¶32. At the same time, the majority finds that PETA put forth no evidence to the contrary. On this point the majority is mistaken – the blank form provided by PETA demonstrates that they were merely seeking information concerning the discomfort, distress, and pain endured by the animals. Examples of the information sought by the IACUC form are

  a.   The species, source, breed, health status, age, sex, etc., of the animals;

  b.   Special requirements for maintaining the animals (temperature range, caging/pen type, bedding/litter type, type of water, diet and feeding requirements);

  c.   The maximum number of animals to be used per level of pain and/or distress;

  d.   An explanation of the type and duration of restraint, and plans to monitor restraint;

  e.   A description of prolonged distress;

  f.   A description of minor invasive manipulations (blood collection, catheterization, etc.);

  g.   Whether drugs or compounds that will be used are approved for use in the species;

  h.   Whether access to food or water will be restricted;

  i.   Whether surgical procedures are involved and, if so, whether the procedures are invasive and whether animals will be subjected to multiple procedures;

  j.   Whether anesthetic, analgesics or tranquilizers will be used to reduce pain or distress;

29

k.      Identification of any prior use of the animals in painful or distressful experiments;

l.      A description of plans to avoid or address unintended pain or distress;

m.      Criteria used to determine a humane endpoint for the animals, the final disposition of the animals and, if the animals will be killed, the method of euthanasia; and

n.      Proof of a literature search designed to reduce, refine, or replace the use of live animals.

It would be difficult to see how this information could be considered proprietary information, and today's opinion offers no explanation as to how this information would have any independent economic value.

¶33.    Third, the majority finds that "the chancellor's error was in concluding that the protocol forms were not developed under contract." However, whether the protocol review forms were developed under contract, is immaterial to this case. The statute plainly states that the question is whether the records constitute "trade secrets and confidential commercial and financial information of a proprietary nature developed by a college or university under contract." Miss. Code Ann. 25-61-9 (Rev. 2006). One cannot circumvent these requirements for exemption simply because the information was produced as a result of a contract. Were this so, the statute would read "trade secrets and confidential commercial and financial information of a proprietary nature *or information* developed by a college or university under contract."

¶34.    Finally, the argument that this Court must reverse the decision of the chancellor because PETA did not provide evidence to dispute the nature of the information contains a

fatal defect: how could PETA possibly provide evidence to the contrary (other than the blank form) without access to the sealed information?

¶35.     After reviewing the sealed documents, I find that none of the information ordered for disclosure is exempt under the Mississippi Public Records Act.  Therefore, because the chancellor did not abuse her discretion, I would affirm the order.